Mel C. Orchard, III (Bar No. 10328)  
THE SPENCE LAW FIRM, LLC  
15 S Jackson St, PO Box 548  
Jackson, WY 83001  
Tel: (307) 733-7290  

Peter J. Flowers (*pro hac vice forthcoming*)  
Matthew J. Herman (*pro hac vice forthcoming*)  
MEYERS & FLOWERS, LLC  
3 North Second Street, Suite 300  
St. Charles, IL 60174  
Tel: (630) 232-6333  

Daniel W. Tarpey (*pro hac vice forthcoming*)  
David G. Wix  (*pro hac vice forthcoming*)  
TARPEY WIX LLC  
225 W. Wacker Drive, Suite 1515  
Chicago, IL  60606  
Tel: (312) 948-9090  

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| CHRISTOPHER BISAILLON, an individual, on behalf of himself and those similarly situated, *Plaintiff*, vs. VAIL RESORTS, INC., a Delaware corporation, *Defendant*. | **CLASS ACTION COMPLAINT AND JURY DEMAND** Case No. Judge: |

Plaintiff, Christopher Bisaillon, on behalf of himself and those similarly situated, through his undersigned attorneys, The Spence Law Firm, LLC, Meyers & Flowers, LLC and Tarpey Wix LLC, and for his Class Action Complaint against Defendant, Vail Resorts, Inc., demands a jury trial and states and alleges as follows:

## INTRODUCTION

1. Defendant Vail Resorts, Inc. ("Vail Resorts"), a $6.7 billion dollar ski resort owner and operations management company, intentionally and willfully deceived hundreds of thousands of consumers when it failed to disclose that the ski patrol and mountain safety personnel union, comprised of workers essential to the safety of the skiers and the operations at Park City Mountain Resort ("Park City Mountain Resort" or "Mountain")

located in Park City, Utah, were on strike during the Christmas and New Year's holiday season of 2024/2025. Families of skiers who saved up all year long in order to spend the holiday break on a family ski trip and who paid up to $289 per day, per person for a one-day lift ticket were faced with waiting up to three hours in lift lines to ski for just minutes as approximately only 16% of the Mountain remained open to the public. Because Vail Resorts failed to disclose the strike and resultant conditions on Park City's operations, what was expected to be a dream vacation for thousands of families, at the expense of tens of thousands of dollars per family, quickly turned into a colossal nightmare.

2. Vail Resorts' epic failure and intentional deceit to the consumer public was aptly described in a live television broadcast by CNBC financial host Jim Lebenthal on January 3, 2025, in a CNBC segment entitled "The Travel Trade." Lebenthal's brutally honest assessment on public television, based on his first-hand, personal experience at Park City Mountain over the holidays, was likewise featured in *Powder Magazine's* article entitled: "CNBC Host 'Angry' at Vail Resorts Over Park City Strike - Jim Lebenthal blasted Vail Resorts for the skiing experience at Park City Mountain Resort while patrollers are on strike." In the aired segment, Lebenthal stated the following:

> I'm a little angry Courtney, and I want to be careful here because I've never used my position on this show as a bully pulpit. I'm just going to speak factually. Alright, you want to talk weather. I was out in Park City, Utah for the last week. We got two feet of new snow. That's every skier's dream, right? Let's go skiing, guys. **Except, the problem is Vail Mountain which owns Park City, didn't let any of us know that there was a ski patrol strike going on so less than 20% of the mountain was open at the peak holiday time**. That meant I got a great time looking at the snow from the ski lines which stretched on for an hour. Here's my point, I'm a little angry at Vail Mountain alright, it's down 6% today, and you know why, and you can see that the stock has been lousy for quite some years. If you want to be in the travel stock; **if you want to run a travel and a leisure company, you darn well better give the experience that you're advertising**. Because if you

don't you will get negative PR and you will get non-repeating customers. Exactly what you don't want.

A link to the video of this CNBC broadcast segment can be found at:

https://www.reddit.com/r/skiing/comments/1hse4c6/vail_resorts_has_officially_pissed_off_wall_street/?utm_source=embedv2&utm_medium=post_embed&utm_content=whitespace&embed_host_url=https://www.powder.com/news/cnbc-angry-vail-resorts-park-city-strike&rdt=43034

3. Indeed, practically every major media outlet from The Today Show on NBC to CNN to Fox News to MSNBC and everywhere in between, have all reported on the disaster created by Vail Resorts at Park City Mountain and its failure to disclose the strike. It is Vail Resort's intentional concealment to the consumer public in this regard, while it continued to collect tens of millions of dollars from that very same consumer public over the holiday season, which constitute violations of the Utah Consumer Sales Practices Act, Utah Code Section 13-11-1, *et seq.* ("the Act"), and serves as the basis for the other causes of action alleged herein including fraudulent concealment and unjust enrichment.

## PARTIES

4. Plaintiff, Christopher Bisaillon, is a citizen of the state of Illinois and resides in Wheaton, Illinois.

5. Defendant, Vail Resorts, is a Delaware corporation with its headquarters located in Broomfield, Colorado.

## JURISDICTION & VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000 and at least one member of the Class is a citizen of a State different from Defendant.

7. Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d). Defendant transacted business and was found in this District; a substantial portion of the affected trade and commerce described herein has been carried out in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A. The Business of Vail Resorts and Acquisition of Park City Mountain Resort**

8. Vail Resorts self-describes itself on its own website as "the premier mountain resort company in the world and a leader in luxury, destination-based travel at iconic locations." The company is divided into three divisions. The mountain segment, which owns Park City Mountain Resort at issue here, owns and operates 42 mountain resorts in four countries. Vail Resorts Hospitality owns or manages hotels, lodging, condominiums, and golf courses, and the Vail Resorts Development Company oversees property development and real estate holdings.

9. By example, some of the ski resorts owned and operated by Vail Resorts include the following: Vail (Colorado), Beaver Creek (Colorado), Breckenridge (Colorado), Keystone (Colorado), Crested Butte (Colorado), Heavenly (Nevada), Whistler Blackcomb (Canada), Stowe (Vermont), and of course Park City Mountain Resort located in Park City, Utah.

10. Vail Resorts' reported revenue for the year 2023 alone was just short of $3 billion, at $2,881,300,000 and revenue reporting for 2024 appears to be similar. In its SEC filings, Vail Resorts has reported a profit averaging at around $825 million over the last several years. Vail Resorts' Chief Executive Officer, Kirsten Lynch, received a total compensation package worth $6,288,586 for fiscal year 2024, according to a report filed with the Securities and Exchange Commission in October.

11. Vail Resorts is a publicly traded company on the New York Stock Exchange, trades under the symbol MTN and is currently trading under the stock price of $177.09 per share.

12. Vail Resorts purchased Park City Mountain Resort in 2014 for $182,500,000 and has owned and operated the ski resort over the last ten years and combined PCMR with Canyons Resort, which it had leased for fifty years beginning in 2013 and renamed as Canyons Village at Park City, in 2015 to create the largest ski resort in the United States and the second largest in North America, only behind Whistler Blackcomb in Canada which is also owned and operated by Vail Resorts.

B. **The Expense of Skiing at Vail Resorts' Park City Mountain Resort**

13. It goes without saying that ski vacations are one of the most, if not THE most, expensive activity-related vacations for a family to take. With the cost of lift tickets rising exponentially over the last decade or so to now reaching $300 per day, per skier in some locations, not to mention the costs of rental equipment, ski gear and lodging, it is normal for a family to expect to spend anywhere between $10,000 to $20,000 for a week-long, or even a long weekend, ski trip.

14. Park City Mountain Resort, under the ownership and management of Vail Resorts, is no exception, but rather, the norm for Vail Resorts' properties. The cost of a one-day lift ticket at PCMR is currently $288.00 for an adult and $189.00 for children twelve and under. These prices are comparable to other, similar Vail Resort properties mentioned in paragraph 9 above.

15. While a skier may be afforded a modest discount off these prices for buying a 2-day, 3-day or 5-day "Epic Pass" as well as those who purchase season passes, skiing still remains one

of the most expensive sports to engage in, especially as a family and especially at one of the properties owned by Vail Resorts.

### C. The Strike of Ski Patrol and Mountain Safety Personnel at Park City Mountain Resort

16. The Park City, Utah, Professional Ski Patrol Association (the "Ski Patrol Union") went on strike on December 27, 2024 (the "Ski Patrol Strike") at Vail Resorts' largest U.S. ski area, Park City Mountain Resort, vying for higher wages and better benefits.

17. The Ski Patrol Union had filed multiple complaints with the National Labor Relations Board as early as December 16, 2025, alleging that Vail Resorts was negotiating the labor dispute relating to wages and benefits in bad faith, engaged in coercive, promissory or threatening acts during negotiations and changed contacts unfairly.

18. Accordingly, as early as December 16, 2024, Vail Resorts knew or reasonably should have known that a strike was coming for the upcoming holiday ski season if it did not reach an agreement with the Ski Patrol Union and it did nothing to alert the public, specifically the tens of thousands of people and families coming to spend the holiday season skiing at Park City Mountain Resort.

### D. Vail Resorts' Failure to Disclose Strike and Resulting Disastrous Conditions

19. Despite knowing since December 16, 2024, that a ski patrol strike was unavoidable, Vail Resorts did nothing to alert the consumer public but went about selling thousands of lift tickets as though it was business as usual.

20. Even when the Ski Patrol Union officially went on strike on December 27, 2024, Vail Resorts unbelievably still did nothing to warn consumers and continued to allow skiers to purchase lift tickets under the auspices that nothing was wrong, and the ski experience would be what the consumers expected.

21. However, as a result of the Ski Patrol Strike, less than 20% of the mountain was open for most of the high-traffic holiday season which resulted in lift lines that lasted for up to 3 hours at times. And after waiting several hours to get on a ski lift, again because of the lack of runs and ski lifts open, skiers were only allowed to ski for a mere few minutes before being forced to get back into a lift line with thousands of skiers waiting.

22. As reported on NBC Nightly News, Park City Mountain Resorts was "paralyzed" by the strike and left lift lines lasting 2-3 hours with less than 20% of the runs on the mountain open.

23. That same NBC News segment included the story of Peter Nystrom, a Minnesota man who spent over $20,000.00 to take his family out west skiing as a special Christmas present and only heard about the strike when they showed up to ski on the first day of their vacation when they faced lift lines of 2-3 hours. As stated by Mr. Nystrom in the segment: "Oh my gosh we're here at one of the best ski mountains in the country and we're waiting 3 hours in line – this is ridiculous." The NBC news story can be found at the following link: https://www.youtube.com/watch?v=eIpscE8VWU8.

24. Similarly, KSL News, the local NBC-affiliate, reported the similar experience of Mike Evans, a visitor from New York. As reported in the KSL News article:

> Evans and his family spent months planning their holiday vacation to Park City with the hope of experiencing the greatest snow on earth over the New Year's holiday, unfortunately, they arrived just as the ski patrol strike hit the mountain.
>
> "We had no idea anything was going on till we pulled into Park City and saw people picketing on the corner," Evans said.
>
> Not fully aware of the strike's impact, Evans and his family hit the mountain's slopes on Tuesday and Thursday last week, only to be met with long lines and closed terrain. On Thursday, he shared his frustration on Instagram.

>Evans says he paid about $1000 for the lift tickets at Park City Mountain Resort and expressed frustration with the communication from the resort about the amount of terrain that would be available to ski.
>
>"You would think that with the type of business that they're running and the people that are coming in, you'd want to figure out a way to get this taken care of," Evans said.
>
>"<u>Or if you have all these people that come in and spend this money, you'd have some way to give them a notification that there's going to be an issue here and give me an opportunity to maybe plan to go to a different place or, you know, make arrangements to ski at a different resort</u>," Evans said.

A link to the January 2, 2025, KSL News article can be found at:

https://kslnewsradio.com/2169037/park-city-ski-patrol-strike-impact-operations/

25. The following photo depicting the long lift lines appeared in the KSL News article:



26. Again, Vail Resorts did nothing to warn the consumer public of this material condition adversely affecting the ski experience of the consumer. And despite the strike starting on December 27, 2024 (and Vail Resorts should have reasonably known about the strike as of December 16, 2024), it was not until January 4, 2025 when Vail Resorts finally included an "Operations Update" on the Park City Mountain Resort website stating: "We are opening the

terrain that is safe to open based on the team members we have each day. Please expect some operational impacts from the ongoing patrol strike."

### E. The Bisaillon Family's Experience at Park City Mountain

27. Similar to the stories of the Nystrom and Evans families discussed above, Plaintiff Christopher Bisaillon had planned a family holiday ski trip to Park City and the Bisaillon family, including Plaintiff, his wife, son and two daughters, traveled from Chicago to Park City on December 27, 2025. Bisaillon was planning on his family having the ski experience which Vail Resorts promises in its promotional videos: "At Vail Resorts our mission is to provide our guests and experience of a lifetime." Vail Resorts sure accomplished that mission for the Bisaillon family, just not in the way Vail Resorts depicts to its customers.

28. The Bisaillon family bought lift tickets through Vail Resort's "Epic Pass" in advance of their holiday ski trip and were planning on skiing multiple days over the week.

29. The Bisaillon family knew nothing of the strike until they arrived at PCMR on December 28, 2024 but heard word of the strike from other consumers upon seeing the massive lift lines.

30. After waiting for hours in lift lines only to ski a few minutes per run because of the majority of the Mountain being closed, Plaintiff and his family called it a day after just three, few-minutes-long runs.

31. The Bisaillon family planned to ski on December 29, 2024 but decided to skip it based on the miserable (but expensive) experience the day before and upon hearing that the conditions were not going to change any time soon.

32. The Bisaillon family attempted to ski again on December 30th and December 31st and, again, faced the same hours-long lift lines with only a few runs open. The Bisaillon family, frustrated and angry, stopped skiing on both of these days after only a few runs.

33. Plaintiff and his family skipped their planned skiing on January 1, 2025 but returned to try again on January 2nd in hopes that the conditions finally improved but were only faced once again with the same terrible experience of insanely long lift lines with only a fraction of the Mountain open. To make matters even worse, if they could be, the Bisaillon family experienced several instances where they approached a lift line which was posting a wait time of 30 minutes, but the actual wait time was well over an hour.

34. Plaintiff spent in excess of $15,000.00 for his family of five to have Vail Resort's publicized "ski experience of a lifetime" over the holidays. It turned out to be a colossal disaster with the family only being able to ski less than ten runs over the duration of their week-long, Christmas family vacation.

## CLASS CERTIFICATION ALLEGATIONS

35. Plaintiff brings this action on behalf of himself, and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the members of the following Class:

    All persons who purchased a lift ticket from Vail Resorts to ski at Park City Mountain Resort to be used from December 27, 2024, through a date now uncertain but when the Ski Patrol Union's strike is over.

36. Excluded from the Class are Defendant, its officers, directors and employees, any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff.

37. The Class is readily ascertainable because records of the relevant transactions should exist.

38. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the services involved, Plaintiff believes that the Class may have thousands of members which are geographically dispersed throughout the United States, the exact number and potentially their identities being known by Defendant.

39. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

40. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions include but are not limited to the following:

    a. Whether the purchase of lift ticket is a covered by the Act;

    b. Whether the Defendant engaged in deceptive and/or fraudulent conduct under the Act;

    c. Whether the Plaintiff and putative class suffered actual damage and the amount thereof;

    d. Whether the Defendant had a duty to disclose the vast majority of the Mountain would be unavailable to ski due to the skip patrol strike;

    e. Whether the Defendant knowingly and fraudulently withheld the issues caused by the ski patrol strike

    f. Whether such information regarding the ski patrol strike was material to the purchase of a lift ticket;

    g. Whether Plaintiff and Putative class reasonably relied on this lack of information in purchasing a lift ticket;

      h. Whether Plaintiff and putative class members were damaged by the concealment of this information concerning the ski patrol strike; and

      i. Whether Plaintiffs are entitled to punitive damages.

41. Plaintiff's claims are typical of the claims of the members of the Class because the claims arise from the same course of conduct by Defendant and the relief sought within the Class is common to each member.

42. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Classes. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

43. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendant and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

44. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

    b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

    c. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## COUNT I
## VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT
(Utah Code Ann. § 13-11-1, *et. seq.*)

45. Plaintiff repeats and incorporates by reference paragraphs 1 through 44 above as if fully set forth herein.

46. At all relevant times, the Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, et. seq. (the "Act") was in effect.

47. The purpose of the Act is to protect consumers from suppliers who commit deceptive and unconscionable sales practices and to encourage the development of fair consumer sales practices.

48. The offering and purchase of lift tickets is a "consumer transaction" as defined by the Act.

49. Plaintiff and the putative class members are "persons" as defined by the Act.

50. As the seller of the lift tickets, Vail Resorts is a "supplier" as defined by the Act.

51. Vail Resorts committed a deceptive act or practice under the Act by, among other things, knowingly or intentionally, selling lift tickets at full value with the indication that Plaintiff

and the Class would have full access to all ski runs and chair lifts when in fact they did not; indicating that the lift tickets would have a particular standard or quality when in fact they did not; selling lift tickets for a purpose that was materially different from what was indicated; and selling lift tickets to Plaintiff and the Class for a purpose that was not available.

52. Defendant's conduct was unconscionable.

53. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have sustained significant damage in an amount to be proven at trial.

54. Plaintiff and the Class are also entitled to the recovery of all reasonable attorneys' fees, costs and expenses incurred in conjunction with the prosecution of its claim under Utah's Consumer Sales Practices Act, Utah Code Ann. §13-11-19(5).

## COUNT II
### (Fraudulent Concealment)

55. Plaintiff repeats and incorporates by reference paragraphs 1 through 54 above as if fully set forth herein.

56. Defendant had a legal duty to communicate and advise Plaintiff and putative class about the Ski Patrol Strike and effect it would have on limiting the ability to ski the Mountain because such information was in the exclusive control of the Defendant and Plaintiff had no ability to otherwise learn of the information. Defendant should have disclosed that almost 80% of the Mountain ski areas would be closed and that wait times for ski lifts would be incredibly excessive, at times 2-3 hours long, which meant that Plaintiff and the putative class would not experience the ski experience that was promised.

57. Defendant knew this information was material and purposely concealed this information from Plaintiff and the putative class.

58. Said information described herein was material to the transaction of Plaintiff and the putative class purchasing and using a lift ticket during the Class Period.

59. Defendant intentionally concealed this information from Plaintiff and the putative class intended upon Plaintiff and the putative to class to rely upon this lack of information in purchasing and using lift tickets and Plaintiff and the putative class reasonably did so.

60. Plaintiff and putative class were unaware of this information and would have acted differently in purchasing and/or using the lift tickets during the class period and have been damaged as a proximate result thereby.

61. As a result of Defendant's fraudulent concealment, Plaintiff and the Class have been damaged.

## COUNT III
### (Unjust Enrichment)

62. Plaintiff reincorporates the allegations from paragraphs 1 through 44 as though fully set forth herein.

63. Plaintiff and the putative class conferred a benefit to Defendant in paying full price for lift tickets when Defendant knew the vast majority of the Mountain was unavailable for skiing and Plaintiff and the putative class would be forced to wait in lines for hours instead of skiing.

64. Defendants have acknowledged the benefit conferred by the Plaintiff and putative class and have accepted and retained the full price of lift tickets.

65. The acceptance of the benefit conferred by the Plaintiff and putative class under these circumstances makes it inequitable for Defendant to retain the full benefit without repayment to Plaintiff and the putative class for the actual value of the lift tickets during the class period.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment against Defendant as follows:

a. An order certifying the Class and appointing Plaintiffs as Representatives of the Class;

b. An order certifying the undersigned counsel as the Class Counsel;

c. An order requiring Defendant, at its own cost, to notify all members of the Class of the unlawful, unfair, deceptive, and unconscionable conduct herein;

d. Judgment against Defendant in an amount to be determined at trial;

e. Punitive damages against Defendant to be determined at trial as result of its fraudulent conduct;

f. An order for injunctive relief prohibiting such conduct by Defendant in the future;

f. Judgment against Defendant for Plaintiff's attorneys' fees, court costs, and other litigation costs; and

g. Any other relief deemed just and proper by this Court.

Respectfully submitted this 9th day of January, 2025,

BY THE SPENCE LAW FIRM, LLC:

_/s/ Mel C. Orchard, III_

Mel C. Orchard, III (Bar No. 10328)
THE SPENCE LAW FIRM, LLC
15 S Jackson St, PO Box 548
Jackson, WY 83001
Tel: (307) 733-7290

*Attorneys for Plaintiff*